STATE OF MAINE
Knox, S.S., Clerks Office
SUPERIOR COURT

FEB 18 2003

RECEIVED AND FILED
Susan Guillette, Clerk

STATE OF MAINE

KNOX, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-97-007
JRA-KNO-2/18/2003

WILLIAM D. ATWOOD,

     Plaintiff

     v.

GEORGE N. ATWOOD,

     Defendant

DECISION AND ORDER

DONALD L. GARBRECHT
LAW LIBRARY

MAR 3 2003

This matter is before the court on the complaint of William D. Atwood (William) who seeks partition of properties he owns in fee with his brother, George N. Atwood (George), as tenants-in-common. The properties are located in St. George and South Thomaston and were acquired by William and George by a deed of distribution from their father's estate.

The property in St. George is a small lot of about 1/10 of an acre with tidal frontage, and is about seventy feet wide and approximately eighty feet deep. It has a marine railway on site. The South Thomaston property is approximately 50 1/2 acres with a narrow, rectangular shape, a depth of about 2,800 feet and a width of approximately 625 feet. The lot runs lengthwise toward the shore from Route 131 and has about 470 feet of road frontage. The family homestead consisting of a ranch-style house and a barn built by George's daughter sits near the road at the southeast corner of the property. The lot enjoys approximately 2,200 feet of shore frontage.

In his complaint, William asks that the court appoint commissioners to set off to each party a share of the subject properties as 14 M.R.S.A. § 6511 permits. He also asks that if the division of properties is unequal, the party with the share of greater value be

ordered to pay the other an amount to equalize the division. William also asks that the cost of the partition process be shared equally by the parties. Finally, although William alleges that his brother has had exclusive use of the South Thomaston property since their father's death in 1988, and has had the benefit of rents from the property, so that he has been denied any use or benefit from this property, he asks for no remedy as to this aspect of the parties' dispute.

In his answer, George denies that he has had exclusive use of the South Thomaston property and that William has been denied its use and benefits. Although he does not address his brother's wish for a partition of their properties, in the Report of Conference of Counsel, George, through his attorney, advises that the issue in the case is the disposition of the properties. Indeed, throughout this litigation, George's position has been that the properties need to be divided.

Because the parties agreed that partition of their properties was appropriate, they submitted a stipulated order to the court which provided for the appointment of three commissioners: a local attorney, a builder, and a realtor, and provided that the cost for their work and the expenses attending partition would be shared by the parties equally. The order also required the parties to submit "best case summaries" which would contain their proposals for the division of the two properties.[1] *See* Stipulated Order re: Procedure for Partition, filed December 7, 1998.

In his best case summary, William asked that the St. George lot be set off to him because he owns the lots which abut this property on either side and because he has improved it by constructing a marine railway there. He also asks that the house and road frontage on the South Thomaston lot along with 5 1/2 acres be provided to

---

[1] The parties filed their best case summaries and the responses to them before the stipulated order was signed, suggesting that the parties had agreed to this process and had carried it out before a judge could endorse the order.

George, excepting a 75 foot right-of-way which would lead to the rest of this property and its shore frontage which would be set off to William.

In his summary, George asked that he be given the St. George lot and that he pay his brother one-half its value. As to the property in South Thomaston, he asked that it be divided in half longitudinally running from the road to the shore, but with the family homestead to be included in his half.

On April 22, 1999, the appointed commissioners filed their "Report of Partition." In this document, they assigned the St. George property to William and gave it a value of $14,000. They divided the South Thomaston property into three parcels. Parcel A, which consisted of five acres, the road frontage on Route 131, and the homestead was given a value of $125,000 and set off to George. He was also given parcel C which contained 3.49 acres and 730 feet of shore frontage as well as a 75 foot wide right-of-way running from Route 131 to parcel C along the southern boundary of the entire property all the way to the shore. Parcel C was valued at $60,000.

In the report, William was assigned parcel B which contained the rest of the South Thomaston property and was valued at $165,000. In this valuation, the commissioners did not include the value of an easement obtained by William which gives access to parcel B via Drury Lane which runs from parcel B across private property to the northeast and then to Route 131.

The commissioners advised in their report that they assigned property to the respective party who had made improvements there, as 14 M.R.S.A. § 6514 requires, but did not consider the brothers' competing claims for rental and occupancy values, payment of taxes, deterioration and waste, or credits for improvements, because they were given insufficient evidence on these issues and believed that their task was only to make a partition as 14 M.R.S.A. § 6511 prescribes.

3

Both parties objected to this report. William complained that the commissioners did not address his claim that George owed rent for his exclusive use of the homestead and that he should be taxed for its waste and deterioration. He also objected to the commissioners' failure to account for improvements William had made in the properties. Last, he objected to the configuration of the right-of-way from parcel A to parcel C because it provided George with more than would be required to access lot C.

For his part, George objected to the commissioners' report because the valuations they relied on were not current, lot C is not "functional" because of its terrain, and the commercial value of the St. George property was not considered. *See* Defendant's Objection filed October 18, 1999.

As a result of these objections, the parties asked for a hearing and a re-commitment to the commissioners to resolve their contentions.

The court considered the parties' objections in an informal hearing, styled as a "pretrial conference." The product of this conference was an order which remanded the matter back to the commissioners, asking them if they had considered current valuations in their report, and whether they had determined if lot C, assigned to George, was buildable. The commissioners were also requested to have soil tests done on lot C so it could be learned if that property was appropriate for residential use.

The court also ruled that an alleged prior agreement as to the division of the properties was inadmissible as evidence in this dispute.

Finally, this court ordered that after the commissioners' report on remand had issued, the court would conduct a hearing on any further objections. Included as a subject for such a hearing would be the "equitable" issues raised by the plaintiff as to George's exclusive use of the homestead and the rents he should pay for this use. *See* Order on Pretrial Conference, December 2, 1999. If the court were to find these

4

meritorious, it would enter a judgment awarding money to the prevailing party which might be "satisfied" in this case or a pending probate case. *Id.* Shortly thereafter, the court ordered a survey of the South Thomaston property prepared at the expense of both parties.

In response to the court's order of December 2, 1999, the commissioners replied that they had not used current valuations, but believed they had used "relative" values based on available information, namely two appraisals, one from 1990, the other from 1998, the parties' opinions, and the experience of the two commissioners in the real estate and building professions. They also replied that had not determined whether or not lot C was buildable but had assumed that that would be confirmed before the partition they proposed would be finally adopted. *See* Commissioners' Response, filed April 24, 2000.

On September 13, 2000, at the request of both parties, the court ordered that the properties be reappraised so that any partition could be based on current valuations. In order to do so, the parties were encouraged to agree upon an appraiser. If they were unable to agree, they were to retain their own who, in turn, would select a third appraiser, all of whom would give their reports to counsel and the commissioners.

On June 7, 2001, the commissioners conducted an evidentiary hearing at which the three appraisers testified.[2]

On December 17, 2001, the commissioners filed their Second Report of Partition. In this document they assigned the St. George property to William. They assigned the South Thomaston property in much the same way as they had in their first report with two significant changes. In the first of these, they expanded lot A from five acres to 20.2

---

[2] Consistent with the order of September 13, 2000, each party had retained an appraiser who together had selected a third.

acres by moving the backline of the lot parallel to Route 131 to the west approximately 1065 feet so that lot A would comprise about 40% of the South Thomaston property.

In the second change the commissioners reduced the length of the right-of-way from Route 131 to the shore so that it stopped along the northerly line of parcel C at a point about one-third of the length of this line from its easternmost terminus. This change would allow access to lot C, but not the water. Further, in shortening the length of the right-of-way, the commissioners enhanced lot B slightly as it would no longer be burdened by that part of the right-of-way that originally had been planned to go all the way to the shore along lot C's northerly line.[3]

The brothers object to the commissioners' second report as well. William contends that the commissioners failed to consider the changes that George and his daughter have made to the homestead which detract from its value.[4] They also failed, according to William, to account for the value to George of occupying the homestead, to the exclusion of his brother, since their father died. Finally, William says the commissioners should have imposed restrictions on the use of lot C to protect the value of lot B.

George complains that the division fails to give him an equal portion of the waterfront in South Thomaston and that William has been given all the valuable shorefront property there for building sites. He contends that lot C, which is assigned to him, is currently landlocked and the proposed right-of-way, because it traverses wetlands, may need DEP permits. Finally, he says that the proposed expansion of lot A is of no practical value because of its steepness and rough terrain.

---

[3] A comparison of plaintiff's exhibits 13 and 14 illustrates the changes made from the first commissioners' report to the second.

[4] George's daughter, Elizabeth Atwood, built a barn near the house on what has become known as lot A. She briefly boarded horses there for others. She and George lived in the house, but had divided it into two apartments.

Because of these objections, both parties requested that the court reject the commissioners' second report.

In response to the parties' objections, the court conducted a hearing at which the three surveyors, both Atwood brothers, and George's offspring, Elizabeth M. Atwood and William M. Atwood, testified. The court also took a view of the South Thomaston property.

As the parties have agreed, when a commissioners' report is challenged, the court may confirm it, recommit the matter back to them, or set it aside, "and new proceedings be had as before." 14 M.R.S.A. § 6521. These "corrective powers," however, are to be applied when either the report itself, or the evidence presented at a hearing challenging the report, "demonstrates bias, prejudice or gross error of the Commissioners, clearly and unmistakably shown." *Eaton v. Hackett*, 352 A.2d 748, 751 (Me. 1976). Said differently, "the action of commissioners in partition will not be set aside on the ground of unequal allotments except in extreme cases, as where the partition appears to have been made upon wrong principles, or where it is shown by very clear and decided preponderance of the evidence that the partition is grossly unequal." *Morse v. Morse*, 150 ME 174, 177, 107 A.2d 496, 498 (1954) (quoting 40 Am. Jur. 68, Partition, § 80).

The party who challenges the commissioners' report must demonstrate "clearly and unmistakably that there was an inequality in the division so substantial as to constitute gross error." *Eaton v. Hackett*, 352 A.2d at 752. In the case at bar, this responsibility falls on the defendant, George. That is because at the hearing on this matter, William conceded that the court does not have the power in a partition action to impose covenants on the use of lot C. He also waived any claim for rents that he says George should have paid for his use of the Atwood homestead over the years, and that

7

he no longer requested a judgment in his favor on the sums he claims were due as rent. Instead, William has asked that the court consider his loss of use and income from this property over the years as part of the equitable factors which would be subsumed in the commissioners' division of property.[5] So, even though the commissioners never addressed the issue of the rental value of George's exclusive use of the Atwood homestead in making their partition, the court is not barred from considering this factor in its determination as to whether the division of property is grossly unequal. *See Libby v. Lorrain*, 430 A.2d 37, 40 (Me. 1981) (exclusive use of residence may be considered in equitable partition of property). Thus, in the end, William has withdrawn all his objections to the commissioners' second report and has asked that it be confirmed, leaving only George's objections for consideration.

In determining whether George has met his burden of persuasion, the court is mindful that, even though it heard from the same witnesses as did the commissioners, the responsibility for equality of the division of the properties rested with them and not the court. *See Eaton v. Hackett*, 352 A.2d at 751. Instead, as noted, the court's task is to determine if George has established "clearly and unmistakably" that the commissioners' division was so substantially unequal as to constitute "gross error" or that these officials were biased or prejudiced. *Id.* at 751-52.

With respect to the latter potential grounds to set aside the report, there was no evidence from any source that the commissioners were other than impartial. They were chaired by a well-respected local attorney with familiarity in real estate matters, and included two men from well-known and reputable real estate and construction firms.

---

[5] This position would be consistent with the complaint which does not ask for a money judgment for rents due, but simply asks for the equitable remedy of partition.

As to the equality of the division itself, the commissioners' task was to balance quantity of property with quality of property in determining its value for purpose of its division. *Id.* at 750. As to value, it is not the precise monetary value which controls, "but the full range of the benefit the parties may be expected to derive from their ownership of their respective shares." *Id.* Moreover, when a party has had exclusion possession of a part of the estate and has made improvements there, that share is to be assigned to that tenant. 14 M.R.S.A. § 6514.[6]

With regard to this last direction, the commissioners assigned lots to the respective party who improved them. So, because William improved the St. George parcel by installing electricity,[7] and lot B by acquiring rights to an easement to construct a road there, those parcels were appropriately assigned to him. By the same token, George permitted his daughter to construct a barn next to the Atwood house which, the appraisers say, added value to that property.[8] That being so, the commissioners correctly assigned that property to him.

As to the dollar valuations of the properties assigned, the court has reviewed the written reports of the appraisers, their testimony before the commissioners, and their testimony before this court. Without reciting the minutiae of their calculations and this court's interpretation of them, it does appear that the property assigned to William is

---

[6] While it is true that the cited statute refers to possession "by mutual consent," and that William has contested George's possession of the homestead by virtue of his failure to pay rent, he never effectively protested this situation, except a demand for rents. All other incidents of possession of property with improvements here were either assented to or tolerated by the other party.

[7] Although William's submissions advise that he installed the railway on the St. George lot, the appraisers understood that he only installed electricity there.

[8] The barn is obviously a permanent fixture on lot A which is to become part of George's property if the report is confirmed. Any potential dispute between George and Elizabeth as to compensation to her for this structure is not for consideration in this case.

9

worth approximately $37,000 more than the property assigned to George.[9] It is also true that the full value of lot C, which has been determined to be buildable with a superior view down the river, will not be realized until a road is constructed to that parcel from Route 131. However, no appraiser testified that such a road could not be built, and the potential cost of the right-of-way appears to have been factored into their calculations as to the values of both lots A and C. Further, contrary to George's objection, lot A would allow the placement of another building lot if the right-of-way is constructed.

Moreover, while it is true that assigning lot A to George gives him property that is not aesthetically attractive, the responsibility for the reduced value of that lot can be assigned to him. That is, the Atwood house is in poor condition due to deferred maintenance, poor upkeep, and the division of the structure into two living units. As George has lived there for approximately 13 years, with and without his offspring, it is only fair that he bear the consequences of the diminished value of that property.[10]

In the end, the court cannot find that George has clearly established that the commissioners' division of the Atwood properties in St. George and South Thomaston is substantially unequal so that it amounts to gross error. Accordingly, the court must confirm the commissioners' second report and enter judgment to that effect.[11]

---

[9] Based on all these submissions, even though it is not a factfinder, the court has distilled the following approximate dollar values to the parcels in questions: St. George lot -- $20,000; lot A -- $150,000; lot B -- $327,000; lot C - $160,000.

[10] Although rents were not considered by the commissioners, to the extent that the equities of the division of property might take into consideration other factors in determining whether or not the commissioners committed gross error in their report of partition, the fact that George has lived at the Atwood homestead at little cost for a considerable period of time supports a conclusion that, in its entirety, the result in this case is subjectively fair. William's loss of rents is conservatively estimated by his attorney to be $30,000. *See Libby v. Lorrain*, 430 A.2d at 40.

[11] Interestingly, 14 M.R.S.A. § 6511 suggests that judgment of partition be made *before* commissioners are appointed, and 14 M.R.S.A. § 6521 advises that judgment is to be entered *after* the commissioners' report is confirmed. Thus, conceivably, an action in partition could have two judgments. This statutory conundrum is of little consequence here. Both parties want partition and the sole issue is the viability of the commissioners' report.

Accordingly, the entry will be:

Commissioners' Second Report of Partition, filed December 17, 2001, is CONFIRMED. The properties identified in said Second Report are set off to William D. Atwood and George N. Atwood respectively with the descriptions there made. The clerk is DIRECTED to file a copy of this Judgment with the Knox County Register of Deeds.

Pursuant to 14 M.R.S.A. § 6516, the parties are to divide equally the costs and fees of the commissioners and that of the third appraiser, Charles B. Washington. All other costs are to be paid by the party incurring same.

So ordered.


Dated: February 14, 2003

John R. Atwood
Justice, Superior Court


**Plaintiff's Attorney:**
Randal Watkinson, Esq.
PO Box 248
Rockland, ME 04841

**Defendant's Attorney:**
Steven Peterson, Esq.
PO Box 330
West Rockport, ME 04865

11